Our second case for this morning is Salazar-Garcia v. Galvan-Pinelo, and I think we'll hear first from Mr. Waren. May it please the Court. Matthew Waring for the respondent appellant, Ms. Emely Galvan-Pinelo. The District Court erred in this case in two critical respects. First, it mistakenly held that Mr. Salazar had custody rights within the meaning of the Hague Convention, and second, after concluding that all the factual prerequisites for the mature child exception were present, it declined to apply that exception for an invalid reason. And either one of these errors merits vacator of the judgment and reversal. So I'm not going to hold myself out as a huge expert in Mexican law, but it seems to me looking at the statutes that are reproduced in the appendix and looking at some of even the original Spanish, that the first of your arguments is a tough haul, because the patria potestas seems to be a very fundamental part of Mexican or the Nuevo León family law. It's not waivable or capable of being given up. There are very specific and high bars for losing it. So maybe from my point of view, if you started with the second of those two points, the mature child exception, it would be helpful, and obviously my colleagues will let you know what they want to hear about. Well, I'm happy to turn to that, Your Honor, although I hope I'll have a chance to address your concern. Just give me a quick response to rest my concerns about the patria potestas. Well, yes, Your Honor. On the point that we don't deny that patria potestas appears to be an important concept in Mexican family law and in Nuevo León, but it clearly can be lost by a parent in a number of ways. And as the district court itself concluded, one of those ways is if it's superseded by a custody agreement between the parties. Well, the statute, though, if we want to just use our own methodologies, there's this section. It's at Supplemental Appendix 39, Chapter 3. This is obviously an English translation. On the ways parental authority responsibility, which is how they're translating patria potestas, may be terminated or suspending, and then you start down the road of Article 443, Article 444. These are dramatic things. And under Article 444, you wind up with a final sentence that says parental authority responsibility can also be terminated when the person exerting parental authority responsibility is, it's translated, is expressly condemned to its loss. And in Spanish, the word expressly also appears. I have it someplace. But anyway, what I don't see in this custody agreement, yeah, expressamente a la perdida de ese derecho, I don't see in the custody agreement an express stripping of this right on the part of the father, Mr. Salazar. And, Your Honor, as we explain in our briefs, the reason for that is because the custody order would have needed to mention patria potestas in order to grant it to Mr. Salazar. But he doesn't need to have it granted. He has it because he's the child's father. If you go back to the previous chapter of the Code, where we begin, we've got Article 412, 13, and so on. Article 414, the authority's exercise, is exerted jointly by both parents. I mean, we understand he's a parent, right? There's no question about that, right? Certainly. So I don't know where you get that there has to be an initial granting before it could be taken away. Well, Your Honor's right that Article 414 seems to speak broadly about parents receiving patria potestas. But Article 416 is also critical to understanding how this operates. In Article 416, the first sentence says that when both parents recognize a child born out of wedlock and they live together, they jointly exert patria potestas. Right. That's the easy case. We don't have that case, do we? There would be no need for the Code to point that out, Your Honor, if it were clear from Article 414 that they would receive patria potestas in that circumstance. Well, they both have to have recognized, I mean, the sentence is doing a little bit of work. They both have to have recognized the child born out of wedlock. So that doesn't always happen. But if they are both recognizing it and they live together, then they jointly exert the authority. And then we come to the other sentence, if they do not live together, that's our case, then you have Articles 380 and 381 for custody. But I don't know that they help you that much. Because there's a distinction. The law keeps saying there's a distinction between custody and patria potestas. It does, it does, Your Honor, and we agree that's a distinction. But again, the fact that in Article 416, the Code specifies that the parents who live together and have recognized the child both receive patria potestas, and that it doesn't, and then that it does not make the same affirmation with respect to parents who don't live together, is telling. Because the Code, the methodology of the Code clearly is to spell out when patria potestas rights are retained in situations where that would be dubious. So, for example, looking at 36 of the separate appendix, these are the provisions on divorce. The Code spells out, well, the judge will decide which of the parents retains patria potestas, and which patria potestas rights they retain, and, and... But interestingly, the word retain is used, it's not conferred. Anyway, I'm worried that... If I could follow up on this a little bit. I think I understand your statutory arguments, and if we were dealing with a question of U.S. law, I'm not sure which way I should come out on that, on the interpretation of the statutes. But we've got this letter from the Mexican Central Authority for administration of the hate convention here, that says, according to the information provided to us, this retention of this child was wrongful, because individuals acquire parental rights, this patria potestad, over a child since the moment of birth or registration before the civil registry as a result of an acknowledgment of paternity. These rights can only be restricted by a judicial determination, which may modify, suspend, limit, or condition the exercise of such rights. There's no express limitation. Why shouldn't we give considerable deference to this letter? Well, Your Honor, because the district court gave it no deference. The district court... You want us to look at this question de novo, though, correct? We do. Well, we should, under 44.1, for sure. Absolutely. So, why should we tell the Mexican Central Authority it's wrong about Mexican law, or have I misunderstood the letter? Well, it's true that the Article 15 process is an important means of getting the foreign countries' views about these legal issues, but I think what the district court in this case did was provide the input, and the problem seemed to be, we don't really know what information was provided to the Mexican Central Authority. But why don't we just take what they say about this parental authority doctrine? They know Mexican law for sure better than we do, and that's why I wanted you to turn to the mature minor exception, which does take us more into an understanding of the meaning of the Hague Convention. What concepts go into the ascertainment about whether this particular minor was mature enough to override what would otherwise be the outcome under the convention? Well, I'm happy to turn to that, Your Honor, but briefly, on the question of the letter, the district court didn't see anything in that letter that it thought helped Mr. Salazar's position, and- Mr. Waring, embracing the district judge's legal analysis of this issue doesn't get you very far, okay? I apologize, Your Honor, but- You want us to reverse him, right? That's true, but on the question of the significance of the letter, we think he got it right. But I'll turn to the mature child exception, as Your Honor's requested. The law says that the district judge has discretion not to apply the exception even when the factual prerequisites are met, but it's not unbridled discretion. It's discretion not to apply the exception when doing so would further the aims of the convention. And the district court's for why rejecting the exception here would further the aims of the convention simply doesn't hold water. Well, could we take this one step at a time? After the district judge has met a couple of times with the child, the child ultimately says, you know, of course, time is going by and the judge is worried about that, but the child ultimately says, I object to going back to Mexico. Yes. So we get that statement. And there doesn't seem to be a question about the child's maturity. So what other factors does the convention permit the district judge to take into account and why was he wrong in the way he looked at them? Well, the factors that the convention directs judges to look at are whether withholding the return remedy would further the aims of the convention. And then there's also the question of undue influence. If there's undue influence behind the objection, that might also be a reason. Now here the district judge didn't reach on undue influence and he looked to the aims of the convention. And the district court's view was that because the DS's objection to wholly on his and his mother's immigration issues, that was the only factor it needed to look at as far as the basis for the objection. And it thought that that was an improper basis because it thought that that was the product of the wrongful retention. And there are two problems with that. The first, as we said, is the immigration issues weren't the only reason for the objection. They were one reason. They were a very important reason. But they weren't the only reason. The DS prefers the schools here in the United States. He thinks they give him a better chance to study for his chosen career. He wanted to maintain his relationship with his new baby sister. So there were a number of reasons. And simply to say that one was dispositive didn't mean it was the only one that the court should consider because other issues were capable of changing the child's mind as well. So do you see aims of the convention as a legal issue or a factual issue? It's a mixed question, Your Honor, in that we know what the aims of the convention are. Are the aims of the convention to protect the parents? The aim of the convention, as this court said in Ultima Ronde Valle, is to deter parents from abducting children across borders so that they can... Or retaining. I mean, there's no abduction, but there's a retention. But to discourage them from trying to engage in foreign shopping in terms of international family law. But that's not what happened here, Your Honor. We're far from the heartland of the Hague Convention. This is a case where Ms. Galvan brought DS to this country with Mr. Salazar's knowledge, with his consent. And at the end of the agreed-upon time, there was a disagreement about what would happen after that. But nobody absconded with a child here. Nobody acted with anything but the child's best interest in mind. And I see I'm into my rebuttal time, but I'll just say briefly that the notion that the district judge needed to protect what he called systemic interests by declining to apply the exception here is simply not right. The travel-related issues here were not some sort of stratagem to get DS to object to going back to Mexico. They occurred before the wrongful retention, if there was any, occurred. So there's simply no link between any violation of the convention and the basis for the objection. And for that reason, we think that the court's reasoning on that point was incorrect. Mr. Waring, is it correct, though, that the district judge was having a conversation with this boy about what would change your mind, right? Correct, Your Honor. And part of it was the immigration status, those situations. He also has a relationship with his father that he wants to preserve, right? He does, Your Honor. And the schools weren't the sole reason that he wanted to stay in the United States, right? No, they weren't. Or the relationship. And so, okay. Thank you. Thank you. All right, thank you. Mr. Brigham. Good morning. May it please the Court. My name is Philip Brigham. I represent the appellee here, Raul Salazar. Mr. Salazar was the petitioner on the case below, was asking the Court to affirm the district court's ruling for two reasons. First, because the district court properly exercised its considerable discretion in refusing to apply the mature minor exception to return. And second, because the district court properly found that Mr. Salazar had rights of custody under the convention, pursuant to the law of New or the Way Home. So in terms of the mature child exception, you refer to the considerable discretion. And I have no problem granting tremendous deference to the district court's assessment, for example, of how mature a particular child might be. I mean, that issue comes up from time to time, whether it's a 10-year-old or a 13-year-old or even an 8-year-old. So, you know, we're not there. That should be the district court's call. I'm less comfortable saying that when the district court is assessing the aims of the convention, that's anything but a legal issue. The convention is about what it's about. It's actually a sort of allocation of court kind of convention, ultimately, so that But I don't see how that really intersects too well with this particular case about the mature minor. Well, Your Honor, I'd note first that the convention itself, when it speaks of the mature minor exception, says that the Judicial Administrative Authority may refuse to return. Of course, because maturity isn't, you know, like, are you wearing a red tie? You know, okay, we can look at you, you're wearing a red tie. Maturity is a much more subtle assessment, so you wouldn't want to write the convention in a way to say must. That would be foolish. Certainly, Your Honor, but my understanding, my position here is that the it's not the, the may is not referencing the maturity exception, or the maturity itself, but rather the entire exception, because it may return if there's a finding that there is this maturity of the child, and the child has an objection to return. Not were the court to say, or were the treaty, rather, to say the court may make a determination about whether or not the child is mature. That would be one thing. Even if the court makes this determination, it's still only a possibility. It's a permissive objection that the court can apply, even if the court makes this determination. And so what, in your view, based on what authorities are the factors the court legitimately can take into account if we accept your position that once we have maybe an agreement, even, that the child is mature? Maybe it's a 16-year-old child that's quite ready to be emancipated. Some 16-year-olds are. So what else would be a legitimate consideration? Well, first, remember, if we were dealing with a 16-year-old child, that would be outside the bounds of the Convention. Fifteen and three-quarters. But, setting that aside, the factors that the court would look at is whether or not exercising that would further the purposes of the Convention. The purposes, as counsel stated, are to ensure or to prevent abduction or wrongful retention of children outside of countries. And so why does this case look... I mean, we've seen cases where, on the retention side, we all agree this isn't a wrongful abduction case because they all sat down, he cooperated in getting the passport, everybody thought there was going to be this year, and then the dispute arises at the end of the year, whether it's just DS's call or whether the parents are going to sit down and think about it again. So the first year isn't really on the table. So, you know, we have some considerations, and there's an allegation made by the district judge that the new husband of the mother is filing a Form I-170, and she's going to get near-relative status, and she'll be able to regularize her status, which would then allow her to go to and from Mexico. I found that actually hilarious. I mean, you know, the immigration cases that we see do not reveal the wheels turning quite that quickly, and it wouldn't surprise me at all if it took her five years for the I-170 to get processed. But putting that to one side, why in a case where there's nothing at all abusive about this, the parties have been very mature, they've had discussions, they've tried to work through the system. The question is, you know, was this retention wrongful? Even the district judge says he doesn't think the wife was doing anything wrong,  and he goes out of his way. Remember that footnote that he has in his opinion. Certainly. The case here, Your Honor, is that the child is not, while he says that he objects to returning to Mexico, at first note that it's not a, that the objection is based off of in part this travel issue, and in part it's also based off of these questions about schooling. Other courts have held that the schooling question is simply not sufficient, and as the judge noted, the objection to return evaporated in the face of this. Well, in the face of the hypothetical, which may or may not have had any relation to reality, he's trying to figure out how much of an influence on your decision is the possibility that you will not be able to see your mother either at all for the next ten years or with any regularity. That's really the question. The judge is making a hypothetical assumption about six months that teases out this factor for the child. How much is his relationship with his mother driving the decision? And he basically says a lot. You know, if I could keep up my relationship with my mother, then my feelings might be different. Certainly, and I'd also note that the child on page 95 of the supplemental appendix also notes that in response to a question he says that some days the object, he does not object to return when the judge asks him a question. Some days, some days, he says in response to the question the judge asks. Well, that's the judge is doing this strange vegetable thing, you know, talking about shrimp and of all things taco beans. As a Texan, I can't even bear to think of that. So the child's being very frank. He's saying, depends how I'm feeling, say I want the shrimp or I want the taco, and if you take one away, I would say. So they're kind of off on this hypothetical. And he's back and forth, and he eventually says, you know, he's looked at the full list of pros and cons, and he objects. He does object, Your Honor, but he also, as I said, he also qualifies that objection. He says some days he doesn't have it. Well, it's not a vehement objection. I think I would agree with you that far. He's not saying, you know, I'm going to jump off the nearest tower if I get sent back to Mexico. He's maybe if not an equipoise, you know, it's a close call for him. And as such, Your Honor, I would say that that is more in the nature of a preference rather than an objection in the meaning of the convention, like as was expressed in the Trudon case where the court ordered return because the objection was not strong but was rather a preference. There's a strict standard to be applied to calculating or determining what the objection is. All of the defenses of the convention are meant to be viewed very strictly. And when you've got an objection that, as Your Honor said, is kind of not a particularly strong objection, I would submit that's more in the nature of a preference than an objection and shouldn't result in a refusal to return. If Roy returns to Mexico, will he be able to travel to the United States on short-term tourist visas by agreement? By agreement? I feel certainly Michael Iyam would allow that. Whether the immigration laws would allow that is a different question. Has the child also overstayed his visa? Yeah. Well, children don't necessarily have much choice about those matters, but that's part of what we're talking about here. A couple of questions, and I hope Mr. Waring might be able to help me with this as well. Where is the boy in school now? I do not know, Your Honor. I'll ask Mr. Waring on rebuttal. And is Mr. Salazar still paying child support? I don't believe he is at this time. I believe he is setting the money that would be going to child support aside into a bank account and anticipating the outcome of this case. Okay. Could you articulate for us, Mr. Salazar or I'm sorry, Mr. Brigham, if we look at Article 416 of the Civil Code of Nuevo Leon, what do you think, what work does that first sentence do under your interpretation of the law? That first sentence, as has been indicated previously, goes to the recognition of the child. If I could refer to the Article 15 letter, the Article 15 letter notes that, according to Mexican law, individuals acquire parental rights over a child since the moment of birth or registration before the civil registry. So that first sentence of Article 16 is talking about the registration of the child, of the acknowledgment, which would be the registration before the civil registry. If I understand your position, though, that would be the law even if that sentence were not in Article 416, correct? Yes, Your Honor. So is it redundant? Does it do any work at all? Your Honor, I believe it's just to distinguish between the, or to raise the question of the second sentence of that particular provision. The second sentence of that provision talks about how custody is determined by when the parents are not living together. So that determination need not be made if the parents are in fact living together because the custodian of custody just refers to where the child will reside. So the first sentence, rather than just saying, if they don't live together, then what is established by Articles 380 and 381 will apply to grant custody of the child. Rather than merely saying that and leaving something up in the air when we're talking about a child born out of wedlock, the first sentence is just an introduction, essentially, to the second sentence. So let me ask you, I mean, maybe this is getting far afield, but in some legal systems, including the Anglo-American legal system, there was a time when a child was born out of wedlock that it was exclusively the mother who had control of the upbringing of that child. The child didn't take his or her father's name. It was the mother. There could be other societies where, one way or the other, once the child's been recognized, it was exclusively the father. So a possibility that pops into my mind is that what the Code of Nuevo León is doing here is saying we're taking the modern approach. When this is a recognized child born out of wedlock and you're living together, there's joint authority. It's not just the mother. It's not just the father. Would there be any historical basis for such a reading in Mexico? It seems to me, Your Honor, that I'm not certain of any historical basis under the Mexican law. I'm just wondering what it was like before the 20th century under Mexican law. I'd be surprised if it was too solicitous of the mother's rights, but maybe I'm wrong. My understanding is that even now there is a certain predisposition in terms of custody for the mother under Mexican law. That's clear, yeah. But in terms of the parental rights themselves, I believe that those are— I'm unaware of any preference for the mother historically. The word is patria, after all, right? Yes, it does. Patria.  If there are no other questions, Your Honor, then I would simply ask that this Court affirm the District Court's rule. All right. Thank you very much. Thank you very much. So, Mr. Waring, you only have about a minute left, but we'll see. We gave you some questions, so I might extend that to two minutes. Thank you, Your Honor. I'll address Judge Hamilton's question first. Diaz is in the eighth grade at the Brentano Math and Science Academy here in Chicago. He's applying to high schools and sitting for examinations, as I understand, still with very high aspirations and still, as far as I know, doing very well in the classroom and enjoying the opportunities he has here. Just briefly, Your Honor, on the mature child exception, you put your finger, Judge Wood, on the problem with the analysis that occurred below. It's that the Court opposed a hypothetical question to Diaz, which didn't reflect reality, and that changed his position, as one would expect. It's an important consideration. And then the Court both zeroed in on that to the exclusion of all the other reasons for his objection and simply didn't really give us a clear explanation as to why giving that any weight furthers the aims of the Convention. Again, this travel problem, even if it were the only reason for Diaz's objection, it has nothing to do with the wrongful retention. So declining to apply the exception on that basis does nothing to deter future violations of the Convention. And it's not really – there's nothing even in the record to suggest that it's any sort of, again, intentional stratagem or anything on Ms. Galvan's part. It's simply an event that occurred during the year that they were here with Mr. Salazar's consent, and it changed Diaz's feelings about where he wanted to live. And the Court simply didn't give a good explanation for why it wouldn't take Diaz's clear objection to returning to Mexico into account. So for that reason and for the other reasons stated in our briefs, we'd ask this Court to reverse the judgment below. All right. Thank you very much. And I should thank all counsel for assisting the Court with this case, as the district court did. We appreciate it. It was very helpful.